IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

LEE D. SIMMONDS and )
PHARM SERVICES, INC., )
                                    )
          Plaintiffs, )
                                    )
vs. ) CIVIL NO. 07-840-GPM
                                    )
CVS PHARMACY, INC., and )
HOOK-SUPERX, LLC, )
                                    )
          Defendants. )

## MEMORANDUM AND ORDER

**MURPHY, District Judge:**

      Plaintiffs Lee D. Simmonds and Pharm Services, Inc., ("Pharm Services") assert claims for conversion, fraudulent misrepresentation, and negligent misrepresentation against Defendants CVS Pharmacy, Inc., ("CVS") and Hook-SupeRx, LLC, ("Hook") in connection with the sale of the assets of a drugstore in Greenville, Illinois, in 2006; the basis of the Court's subject matter jurisdiction is diversity. This matter is currently before the Court on Defendants' motion for summary judgment (Doc. 22).[1] The facts concerning the asset sale are sharply disputed (rendering summary judgment inappropriate, of course, save with one exception to be discussed presently), but the Court will do its best to recount the events underlying this lawsuit, or at least the parties' respective versions of those events.

---

1. Pursuant to Rule 56 of the Federal Rules of Civil Procedure, "judgment . . . should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

In 1999 Mr. Simmonds, acting individually and in his capacity as the sole shareholder of Pharm Services, entered a license agreement – a franchise agreement, in essence – with Medicine Shoppe International, Inc., ("Medicine Shoppe") authorizing him to operate a Medicine Shoppe drugstore in Greenville. *See* Complaint ¶¶ 2-7 & Ex. A thereto. Under the terms of the license and certain ancillary agreements, Medicine Shoppe agreed to extend credit to Mr. Simmonds and in return took a security interest in the form of a mortgage, presumably (though it is not entirely clear from the record) on the premises of the drugstore. *See* Doc. 37, Ex. A ¶¶ 9-10. In return for capital and various other kinds of assistance in operating the drugstore, Mr. Simmonds agreed, inter alia, to operate the drugstore in conformity with very specific requirements fixed by Medicine Shoppe, to remit a percentage of the store's profits to Medicine Shoppe as license fees, and to submit periodic reports about the store's business to Medicine Shoppe. *See* Complaint, Ex. A; Doc. 37 Ex. A ¶ 11. The license provided that defaults in meeting its fee and reporting requirements could result in termination of the license and that under certain circumstances Medicine Shoppe could assume operation of the drugstore. *See* Complaint, Ex. A § 12(10), § 9(D).[2]

The relationship between Medicine Shoppe and Mr. Simmonds proved not to be a happy one, as on two occasions, in October 2005 and February 2006, Medicine Shoppe advised Mr. Simmonds that he was in default of his fee and reporting obligations under the license. *See* Doc. 37, Ex. A ¶¶ 12-13. Finally, in December 2006, the drugstore was sold to Hook, a limited liability company of which CVS is a member. *See* Complaint ¶ 9, ¶ 12-13; Doc. 1 ¶¶ 5-6. It is here that matters become murky.

---

2. Naturally, the license is a considerably more complex document than the above recitation of its contents may suggest. The Court, of necessity, is recounting in a simplified manner only those provisions of the license pertinent to the matter at hand.

According to Mr. Simmonds, on December 12, 2006, he was notified by a franchise business consultant for Medicine Shoppe that the licensor had sold Mr. Simmonds's drugstore to CVS for $100,000, together with the value of the store's inventory. *See* Doc. 33 ¶ 5. The next day representatives of CVS came to the store and removed drug inventory, prescription lists, and a computer. *See* Doc. 20 ¶ 10. Mr. Simmonds cooperated with the CVS representatives by, for example, helping them to establish an Internet connection; however, he did so, he avers, because he believed that Medicine Shoppe had exercised its option under the license to take over his business. *See* Doc. 22 ¶ 25; Doc. 33 ¶ 8. After the CVS representatives had departed with the store's assets, Mr. Simmonds claims, he discovered that he was still in control of the business because CVS sent him for his approval a proposed asset purchase agreement that he rejected. *See* Complaint ¶ 14; Doc. 33 ¶ 9; Doc. 22, Ex. A-3. Because he remained in control of the store, Mr. Simmonds asserts, the store's assets were wrongfully taken.

Naturally, Defendants offer a different version of events. According to them, a copy of the proposed asset purchase agreement, which clearly shows that the sale was to be between Pharm Services and CVS, not Medicine Shoppe and CVS, was faxed by CVS to Mr. Simmonds on December 11, 2006. *See* Doc. 22, Ex. A-1, Ex. A-3. Although Defendants concede that he did not sign the agreement, they argue that it was sufficient to put him on notice that he remained in control of the store and could refuse to permit the removal of its assets if he wished. According to them, Mr. Simmonds's cooperative behavior during the CVS representatives' visit to the store on December 13, 2006, manifests his consent to the removal of the store's patient files, records, and inventory. In view of this consent, they argue, Mr. Simmonds cannot claim that the store's assets were wrongfully taken.

Obviously, this case presents a classic swearing contest, and it will be up to the jury to determine which side's version of events is more credible. For example, with respect to the conversion claim in this case, whether Mr. Simmonds consented to the taking of the store's assets or was, as he claims, under the mistaken impression that Medicine Shoppe had exercised a right under the license to sell the store out from under him is a question for the jury.[3] Similarly, for purposes of his fraud claim, it is for the jury to determine the reasonableness of his reliance on any representations by Defendants that they had authority to remove patient files, records, and inventory from the store. *See Duran v. Leslie Oldsmobile, Inc.*, 594 N.E.2d 1355, 1360 (Ill. App. Ct. 1992) (a misrepresentation is actionable as fraud only if reliance upon it is reasonable). The Court has no power to resolve issues of intent and credibility on summary judgment. *See Betaco, Inc. v. Cessna Aircraft Co.*, 32 F.3d 1126, 1138 (7th Cir. 1994). Summary judgment as to Plaintiffs' claims of conversion and fraudulent misrepresentation will be denied.

With respect to the claim of negligent misrepresentation in this case, the Court finds that Defendants are entitled to judgment as a matter of law. Under the familiar "economic loss" rule, a plaintiff "cannot recover for solely economic loss under the tort theories of strict liability, negligence and innocent misrepresentation." *Moorman Mfg. Co. v. National Tank Co.*, 435 N.E.2d 443, 453 (Ill. 1982). This is because of the differing policy rationales underlying contract law and tort law: "Tort theory is appropriately suited for personal injury or property damage resulting from

---

3. Conversion is, of course, "the wrongful deprivation of one who has a right to the immediate possession of the object unlawfully held." *Republic Tobacco, L.P. v. North Atl. Trading Co.*, 254 F. Supp. 2d 985, 1006 (N.D. Ill.2002). By the same token, consent by the lawful possessor, either express or implied by silence where a reasonable person would speak if objecting, constitutes lawful justification for interference with property and is a valid defense. *See* W. Prosser, W. Keeton, Prosser and Keeton on Torts, § 18 at 112 (5th ed. 1984).

a sudden or dangerous occurrence . . . . The remedy for economic loss, loss relating to a purchaser's disappointed expectations due to deterioration, internal breakdown or nonaccidental cause, on the other hand, lies in contract." *Id*. at 450.[4] Illinois law recognizes an exception to the economic loss doctrine "where one who is in the business of supplying information for the guidance of others in their business transactions makes negligent representations." *Id*. at 452. *See also Tolan & Son, Inc. v. KLLM Architects, Inc.*, 719 N.E.2d 288, 294 (Ill. App. Ct. 1999) ("[N]egligent misrepresentation by a defendant in the business of supplying information for the guidance of others in business transactions is an exception to the *Moorman* doctrine.") (citation omitted). However, this exception is inapplicable in this case. Summary judgment will be granted as to Plaintiffs' claim for negligent misrepresentation.

To conclude, Defendants' motion for summary judgment (Doc. 22) is **GRANTED IN PART** and **DENIED IN PART**. Summary judgment as to Count I and Count III of Plaintiffs' complaint is **DENIED**. Summary judgment as to Count II is **GRANTED**.

**IT IS SO ORDERED.**

DATED: 02/27/09

                                                s/ *G. Patrick Murphy*
                                                G. PATRICK MURPHY
                                                United States District Judge

---

4. It perhaps is worth noting that the so-called *Moorman* rule barring a plaintiff from recovering purely economic losses in tort applies even where, as here, the plaintiff cannot recover under a contract theory. *See Anderson Elec., Inc. v. Ledbetter Erection Corp.*, 503 N.E.2d 246, 249 (Ill. 1986).